UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

CHRISTOPHER LIVECCHI, *et al.*,

        Plaintiffs,

    v.

OTIS ELEVATOR COMPANY,

        Defendant.

18-CV-333-LJV
DECISION & ORDER

───────────────────────────────

On October 31, 2017, the plaintiffs, Christopher and Darleen Livecchi ("the

Livecchis"), filed this action against Otis Elevator Company ("Otis") under New York

State law.[1]  Docket Item 1-2.  The Livecchis allege that on December 14, 2016,

───────────────

[1] The Livecchis brought this case in New York State Supreme Court, Erie County.  Docket Item 1-2.  On March 13, 2018, Otis removed the case to the United States District Court for the Western District of New York based on diversity of citizenship.  Docket Item 1; *see* 28 U.S.C. § 1332(a) (providing that "[t]he district courts . . . have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different [s]tates"); *id.* § 1441 (providing for removal of "civil action[s] brought in a [s]tate court of which the district courts of the United States have original jurisdiction" under section 1332).  On October 3, 2022, the case was reassigned to this Court.  Docket Item 60.

The Livecchis are citizens of New York, while Otis is a citizen of New Jersey, where it is incorporated, and Connecticut, where its corporate headquarters are located.  Docket Item 1 at ¶¶ 6, 8-9; Docket Item 1-2 at ¶¶ 1-2; *see* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every [s]tate . . . . by which it has been incorporated and of the [s]tate  . . . where it has its principal place of business . . . "); *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010) (noting that a corporation's "principal place of business" is "normally . . . the place where the corporation maintains its headquarters").  In addition, the Livecchis are seeking far more than $75,000 in damages.  *See* Docket Item 67-4 at ¶¶ 17-18 (stating intent to seek compensation for lost wages of "approximately $100,000 per year" as well as medical expenses); *see* Docket Item 1 at ¶ 4 (stating that plaintiffs' "claim for total damages [is] well in excess of $75,000").  So this Court clearly has diversity jurisdiction.

Christopher Livecchi ("Livecchi"), then a "correction officer" at Gowanda Correctional Facility ("Gowanda"), Docket Item 67-30 at ¶ 19; Docket Item 69-9 at 4, ¶ 19, was using one of the facility's elevators when it "malfunctioned," causing him "serious injuries" and depriving his wife, Darleen Livecchi ("Darleen"), of his "services and society."[2]  Docket Item 1-2 at ¶¶ 3-4, 18; Docket Item 67-30 at ¶¶ 1-2; Docket Item 69-9 at 1, ¶¶ 1-2.  The Livecchis say that Otis, the entity "responsible for the maintenance" of Gowanda's elevators at the time, caused those injuries through its negligence.  Docket Item 1-2.

On May 15, 2023, Otis moved for summary judgment.  Docket Item 67.  The Livecchis then responded, Docket Item 69; and Otis replied, Docket Item 70.

For the reasons that follow, the Court denies Otis's motion.

## BACKGROUND[3]

### I.    THE PARTIES

Livecchi is a former "correction officer" who began to work at Gowanda in November 1996.  Docket Item 67-30 at ¶ 19; Docket Item 69-9 at 4, ¶ 19.  He has been

---

[2] Throughout this decision, the Court uses "the Livecchis" when referring to both plaintiffs, "Livecchi" when referring only to Christopher Livecchi, and "Darleen" when referring only to Darleen Livecchi.

[3] On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party. *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The following facts are taken from the parties' statements of material facts, Docket Item 67-30 (Otis's statement); Docket Item 69-9 (the Livecchis' statement); Docket Item 70-2 (Otis's reply statement), and the exhibits incorporated in those filings.  Any disputed facts are resolved in favor of the plaintiffs, the non-moving party.

Throughout this opinion, page numbers for docket citations refer to ECF pagination.  The Livecchis' statement of material facts contains both an "opposing statement" responding to Otis's statement that is numbered from paragraph 1 to paragraph 78, *see* Docket Item 69-9 at 1-14 (bolding, underlining, and capitalization omitted), and a "counter statement" of its own that is numbered from paragraph 1 to

married to his wife, Darleen, since 1990.  Docket Item 67-16 at 10.  Otis is an "elevator company that maintains[ and] services . . . elevators all over the world."  Docket Item 67-18 at 9, 11 (deposition of Otis maintenance supervisor Patrick Koenig); Docket Item 69-9 at 14, ¶ 1; Docket Item 70-2 at ¶ 1.

## II.   THE SERVICE CONTRACT

In 2011, after submitting a "successful[] bid," Otis entered into a "full-service contract" with "New York State to maintain ten elevators at . . . Gowanda."  Docket Item 69-9 at 15, ¶¶ 3-5; Docket Item 70-2 at ¶¶ 3-5.  Under that contract, which remained in effect through the end of 2016, "Otis was required to maintain the elevators and keep them functioning properly and safely" and to "prepare and submit a preventative maintenance schedule."  Docket Item 69-9 at 15, ¶¶ 5, 7; Docket Item 70-2 at ¶¶ 5, 7; *see also* Docket Item 67-10 at 22 (providing that the contract between New York State and Otis would last from January 1, 2012, until December 31, 2016).  Notwithstanding that contract, the elevators were owned by New York State, which was "responsible for maintaining [the] power or electricity that [ran] the elevators."  Docket Item 67-30 at ¶ 64; Docket Item 69-9 at 12, ¶ 64.

When an elevator issue requiring Otis's attention arose, there was a "process" to follow.  Docket Item 67-30 at ¶¶ 65-66; Docket Item 69-9 at 12, ¶¶ 65-66.  William Muck, a maintenance supervisor at Gowanda and the facility's "primary contact" with Otis,

---

paragraph 48, *id.* at 14-20 (bolding, underlining, and capitalization omitted).  For the sake of clarity, citations to Docket Item 69-9 include both a page and paragraph number.

would call Otis's "800 number"—known as "Otis Line"[4]—and the elevator company would "dispatch" a mechanic as needed.  Docket Item 67-21 at 24-25; Docket Item 67-30 at ¶¶ 66-67; Docket Item 69-9 at 12, ¶¶ 66-67.  In 2016, Anthony Grimmelt was Otis's "elevator route mechanic" primarily responsible for servicing Gowanda's elevators.  Docket Item 67-30 at ¶¶ 34-35; Docket Item 69-9 at 6, ¶¶ 34-35; Docket Item 67-17 at 15, 21, 29.

Grimmelt "follow[ed] a schedule" that he received through an application on his "PDA/phone," and he "would go to Gowanda . . . to perform . . . routine scheduled maintenance" as well as for "callback[s]"—that is, to respond to "complaint[s] or service call[s]."[5]  Docket Item 67-30 at ¶ 39; Docket Item 69-9 at 7, ¶ 39; Docket Item 67-25 at ¶¶ 5-7.  When "performing maintenance, [Grimmelt] would use the application on [his] phone to input the type of work . . . performed, . . . the amount of time spent, and other information."  Docket Item 67-25 at ¶ 6.  At most sites, Grimmelt did so as he was performing the maintenance, but when working at Gowanda—which did not allow him to

---

[4] Otis refers to this phone number as both "Otisline" and "Otis Line"; the Livecchis refers to it as "Otis Line."  *See generally* Docket Item 67-30 and Docket Item 69-9.  For the sake of consistency, the Court refers to it only as "Otis Line."

[5] Otis makes this assertion in its statement of facts and further asserts that "any time [Grimmelt] went to Gowanda . . . , the visit and work performed would be recorded in Otis software or logs."  Docket 67-30 at ¶ 39.  While the Livecchis dispute that numbered statement, *see* Docket Item 69-9 at 7, ¶ 39, they appear to do so only to the extent that Otis is asserting that the "software" and "logs" accurately reflect the work that was actually performed.  Docket Item 69-9 at 7, ¶ 39; *see also id.* at 6, ¶¶ 34-35; 16-17, ¶¶ 15-19 (describing how Otis mechanics "received instructions" on "what elevators needed service and what service was necessary" through "their phones"); Docket Item 69-9 at 17, ¶ 23 ("Without phones, [Otis] mechanics would have to try and remember what they were supposed to do with respect to the various elevators, go in, do it, and then come back out and input information about what they had done.").

bring his phone into the facility—he would "input the information from the parking lot while in [his] vehicle immediately upon exiting the facility."  *Id.*

## III.    THE A SOUTH ELEVATOR

One elevator that Otis was responsible for maintaining under the contract was the so-called "A south" elevator—one of two elevators located in Gowanda's A tower, one of the facility's "two main towers."  Docket Item 67-30 at ¶¶ 20-21; Docket Item 69-9 at 4, ¶¶ 20-21.  Like the other elevator in A tower—known, as one might expect, as the "A north" elevator, Docket Item 67-30 at ¶ 21; Docket Item 69-9 at 4, ¶ 21—the A south elevator ran "from the sixth floor" to the "[b]asement," Docket Item 67-16 at 65.

Before the incident on December 14, 2016—described below—Livecchi "never experienced any problems or issues with the A . . . south elevator," and he had even used the elevator without any issues earlier on that day.  Docket Item 67-30 at ¶¶ 24, 28; Docket Item 69-9 at 5, ¶¶ 24, 28.  Further, Livecchi "[is] not aware of anyone else making a complaint or advising [him] of any problems . . . observed or experienced with [the A south] elevator" before December 14, 2016, Docket Item 67-16 at 87, although "in general, everybody that works [at Gowanda] knows that the elevators malfunction from time to time," *id.* at 124; *see* Docket Item 67-30 at ¶¶ 26-27; Docket Item 69-9 at 5, ¶¶ 26-27.

Thad Barber, a Gowanda correction officer, testified that a few months before Livecchi's incident, one of the A tower elevators "dropped several floors"—in a way that "felt like a free fall"—while he was using it, although he could not recall whether it was the A south or A north elevator.  Docket Item 67-23 at 20-24.  Barber reported that incident to "the watch commander."  *Id.* at 24.  And Michael Emhoff, another Gowanda

correction officer, testified that prior to December 14, 2016, he had "heard of a couple complaints" about the A tower elevators, including issues regarding elevators "dropp[ing] a couple floors . . . or not opening."  Docket Item 67-22 at 23-24.

## IV.   THE DECEMBER 14, 2016, INCIDENT

On December 14, 2016, Livecchi worked a double shift at Gowanda.  Docket Item 67-16 at 88-89 (deposition testimony).  It was an "unusually warm" day and Livecchi "[does not] recall" whether or not it was "windy."  *Id.* at 90-91.  "[A]t some point close to but before three p.m.," Livecchi entered the A south elevator from the fifth floor of the A tower and "pressed the [button for the] ground [floor]."  *Id.* at 88, 102.  That button lit up and the doors closed—just as they usually did.  *Id.* at 102-03.  Livecchi, who was alone in the elevator, "st[ood] there[] . . . [and] watch[ed as] the numbers" in a "box" in the elevator indicating what floor the elevator was on "[went] down."  *Id.* at 104-05.  When the "[number] two appeared"—indicating that the elevator had reached the second floor—"the elevator shook" and Livecchi "heard . . . metal scraping[] sounds in both top corners."  *Id.* at 105.  Then, "the elevator appeared to speed up"—that is "mov[e] down faster"—before "it slammed down and bounced up" as the lights "went out[ and then] came back on."  *Id.* at 105-06.  Livecchi's "knees buckled," and he "felt [as if] someone punched [him] in the . . . mid-back on the . . . right side."  *Id.* at 110-11; *see also* Docket Item 67-5 at ¶ 2 (Livecchi's response to Otis's interrogatories stating that during the accident, "[his] knees buckled and [he] felt a pop in [his] back"); Docket Item 67-30 at ¶ 8; Docket Item 69-9 at 2, ¶ 8.

After the elevator had "slammed down," the automated, "electronic voice" of the elevator announced "basement" and "twice" stated "elevator in service mode."  *Id.* at

106.  Finally, the elevator "on its own, started going back up" before "stop[ing]" again
without the "doors . . . open[ing]."  *Id.* at 107.  So Livecchi "pressed [the button for the
ground floor] again," and "[t]he elevator went down to the ground floor and opened up,"
allowing him to exit.  *Id.*  He "did not notice anything else [amiss] about the elevator" as
he exited.  Docket Item 67-30 at ¶ 32; Docket Item 69-9 at 6, ¶ 32.

Following the incident, Livecchi "did not tell any of the [other] correction officers,
including the one that was taking over his shift, to avoid or not use the [A south]
elevator" nor did he "tell anyone to lock th[at] elevator down."  Docket Item 67-30 at
¶ 33; Docket Item 69-9 at 6, ¶ 33.  In fact, the elevator "was not shut down
and . . . continued to be operational" after the incident.  Docket Item 67-30 at ¶ 75;
Docket Item 69-9 at 14, ¶ 75.  But Livecchi did tell "the lobby officer" about the incident.[6]
Docket Item 67-16 at 136-37.

Muck learned about the incident several days after it occurred.  Docket Item 67-
21 at 30-32.  He then "had somebody"—likely, Gowanda's electrician, Tim Burns—
"check out the operation of the [A south] elevator to see if what was claimed could
happen or not happen."  *Id.* at 32; Docket Item 67-30 at ¶ 73; Docket Item 69-9 at 13,
¶ 73.  At the time that it was checked, the elevator was operating normally, Docket Item
67-30 at ¶ 74; Docket Item 69-9 at 13-14, ¶ 74, although Muck stated that "a couple
weeks later" one of Gowanda's "maintenance men . . . observed the same situation that
happened to" Livecchi, Docket Item 67-21 at 34-35.  Muck does not recall whether or
not he reported Livecchi's incident to Otis Line, but he stated that when there was an

---

[6] Livecchi also "went to the infirmary" at "approximately" 4:40 p.m. due to pain in
his back.  Docket Item 67-16 at 139.  The pain was worse the next morning.  *Id.* at 142.

incident in an elevator that "involve[d] an injury," he would "usually"—"nine times out of ten"—"call [Otis Line] to [have the issue] check[ed] . . . out."  *Id.* at 36-37; *see also id.* at 37 (Muck stating that he could not say "[one] hundred percent" that he reported Livecchi's incident to Otis but that he "believe[d he] did because it involved an injury"). And Muck believes that if he did not report Livecchi's incident, he *did* report the second incident involving the maintenance man.  *Id.* at 35-37.

As a result of the incident in the A south elevator, Livecchi sustained "traumatic injuries to his cervical, thoracic[,] and lumbar spine," *see* Docket Item 67-5 at ¶ 9, requiring significant medical treatment, *see* Docket Item 67-16 at 145-184 (deposition testimony on medical care received by Livecchi following the incident).  He was unable to work at Gowanda after January 19, 2017, and he was "terminated" about a year later. *Id.* at 153-54.  Livecchi seeks damages for "pain and suffering, loss of household services, past and future medical expenses, and past and future economic loss"; likewise, Darleen seeks damages "for loss of services, society, consortium, and companionship of her spouse."  Docket Item 67-5 at ¶ 9; *see* Docket Item 1.

## V.   RECORDS AND EXPERT TESTIMONY

In support of its motion for summary judgment, Otis submitted its repair and maintenance records for "elevator 86-W2"—the A south elevator, Otis says—for the period from January 2016 until May 2017.[7]  Docket Item 67-30 at ¶¶ 40-44; Docket Item 67-7 (maintenance records).  According to Otis, those records show that "scheduled

---

[7] Otis refers to these records both as "Exhibit F," *see* Docket Item 67-30 at ¶ 43; *see also* Docket Item 67-7 (records designated at "Exhibit F"), and as "[D]eposition Exhibit A" because they were shown to Grimmelt as "Exhibit A" during his deposition, *see* Docket Item 67-30 at ¶ 41; *see also* Docket Item 67-17 at 71-73.

maintenance was performed on the [A south] elevator" nine times in the year before Livecchi's incident and that during that same period, "there were only two . . . complaints or issues" reported: one involving a malfunctioning door and the other regarding a problem with the "fuse/breaker."  *See* Docket Item 67-30 at ¶¶ 43-44 (citing Docket Item 67-7).

During his deposition, Otis mechanic Grimmelt was "unable to identify which of the elevators listed in the contract [between New York State and Otis] was the one Otis designated as 86-W2."[8]  Docket Item 69-9 at 7, ¶ 38; *see* Docket Item 67-17 at 71-72. Following his deposition, Grimmelt submitted an affidavit stating that "[a]lthough when [he] examined the records during [his] deposition, the format of the information was not familiar to [him]," those records—for elevator 86-W2—are indeed those of the A south elevator.  Docket Item 67-25 at ¶¶ 7-9.  And Otis maintenance supervisor Koenig testified that the A south elevator was designated as 86-W2 in Otis's records, although he stated that he reached that conclusion only after "talking to [Grimmelt]."  Docket Item 67-18 at 38-40.

Otis also submitted the affidavit of John B. Halpern, a licensed professional engineer who has worked in the field of "vertical transportation"—"includ[ing] matters of the design, construction, installation, maintenance, and repair of elevators"—"since 1971."  Docket Item 67-27 at ¶ 1.  Based on his review of the evidence submitted by Otis, as well as a site examination and weather data, *id.* at ¶¶ 4-5, Halpern attested "[t]o a reasonable degree of engineering certainty[ that] the cause of the sudden stop

---

[8] Otis disputes this characterization of Grimmelt's testimony.  *See* Docket Item 70-2 at ¶ 26.

experienced by [Livecchi] was a momentary power outage," *id.* at ¶ 19; *see also id.* at
¶ 22-23.  Halpern noted that "at the time of . . . Livecchi's incident[,] the wind [at
Gowanda] was gusting up to 38 [miles per hour]."  *Id.* at ¶ 20.

The Livecchis dispute the accuracy of both the submitted records and Halpern's
testimony.  *See* Docket Item 69-9 at 7, ¶ 40 ("It has not been established that 86-W2 is
the [elevator that is the subject of this litigation]."); *id.* at 7, ¶ 38 (noting inconsistencies
in Grimmelt's testimony); *id.* at 12, ¶ 67; 14, ¶ 76 (asserting that Muck's testimony that
he likely called Otis Line to report Livecchi's incident—which is not reflected in Otis's
records—suggests that not all calls to Otis Line were documented in maintenance
records).

In addition, the Livecchis offered the testimony of their own expert, William
Seymour, a "[s]enior [e]levator [c]onsultant" who has been "actively engaged in the field
of elevating devices for over thirty-five . . . years."  Docket Item 69-5 at ¶ 1.  Based on
his review of the evidence submitted and a "site inspection and examination" of the A
south elevator, *id.* at ¶¶ 3-5, Seymour opined "with[] a reasonable degree of
professional certainty" that Livecchi's incident was the result of "ongoing, intermittent
erratic failures of the elevator controllers and/or drives" of the elevators in Gowanda's A
tower, *id.* at ¶ 49(m); *see also id.* at ¶¶ 2, 46-49.  He further stated that this "erratic[]
behavior" was caused by "inadequate periodic maintenance"—in other words, by Otis's
negligence.  *Id.* at ¶¶ 48-49.  Seymour also said that based on his review of the

evidence, including Otis's records, it was not clear that the A south elevator was, in fact, elevator 86-W2.[9]  *Id.* at ¶ 50.

## LEGAL PRINCIPLES

Under Federal Rule of Civil Procedure 56, a court appropriately grants summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "The movant"—that is, the party seeking summary judgment— "has the burden of showing that there is no genuine issue of fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The movant may satisfy that burden by relying on evidence in the

---

[9] Seymour contended that the A south elevator was actually designated as 86-4 in Otis's records, Docket Item 69-5 at ¶ 7, and he stated that "several component parts" of the A south elevator that he examined on site were "labeled with the number '4,'" *id.* at ¶ 51.  He nonetheless analyzed the records for both elevators, "86-W2" and "86-4," in his report.  *Id.* at ¶ 42.

Each side asserts that the other's expert is unqualified and reviewed the incorrect records.  *See* Docket Item 70-3 at 4-8 (noting that Seymour "attended a two-year engineering program at the Limerick College of Technology" and arguing that "[a] two[-]year program, completed almost [forty] years ago, with no relevant coursework, does not provide him the requisite 'education' required to serve as an expert witness" and arguing that Seymour "relied upon the wrong set of records to . . . reach [his] opinions"); Docket Item 69-9 at 19, ¶ 35 (asserting that "Halpern[] has no expertise or qualifications in the field of biomechanical science" and "made no effort to determine whether [Otis] did all of the maintenance that [it was] required to do").  Absent a motion connected with the pending motion for summary judgment, the Court declines to address whether either or both are qualified to serve as an elevator expert.  But the Court notes that each side may—and indeed, Otis already has, Docket Items 91-93—file a motion in limine to preclude the testimony of the other's expert at trial.  *See Linwood v. Schindler Elevator Corp.*, 2019 WL 5722110, at *3 n.5 (S.D.N.Y. Jan. 25, 2019) (stating that it was "open to question" whether the plaintiff's expert—in fact, Seymour—was a "qualified expert" but "accept[ing]" that he was for the "purposes of th[e] motion [for summary judgment]" and stating that "[w]hether [he] ultimately qualifies as an expert on any subject . . . can be addressed by motion in limine before trial").

record, "including depositions, documents, . . . [and] affidavits," Fed. R. Civ. P. 56(c)(1)(A), or by "point[ing] to an absence of evidence to support an essential element of the [non-moving] party's claim," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *see* Fed. R. Civ. P. 56(c)(1)(B).

Once the movant has satisfied its initial burden, the non-moving party "must come forward with specific facts showing that there is a genuine" dispute of material fact—that is, that a "rational trier of fact [could] find for the non-moving party" on the "record taken as a whole." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations, emphasis, and internal quotation marks omitted). If the non-moving party fails to do so, the court will grant summary judgment. *See Celotex*, 477 U.S. at 322-23; Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In deciding a motion for summary judgment, "[t]he court must view the evidence in the record in the light most favorable to the non-moving party" and "draw[] all reasonable inferences in that party's favor." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465-66 (2d Cir. 2001). But "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *see also Matsushita*, 475 U.S. at 586 (non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" to defeat summary judgment when moving party has met its burden). Instead, under Rule 56, the party opposing a motion for summary judgment

must "properly support an[y] assertion[s] of fact," Fed. R. Civ. P. 56(e), by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 324.

## DISCUSSION

"In order to prevail on a negligence claim, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach [of that duty], and (3) injury proximately resulting [from that breach]." *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825, 59 N.E.3d 485, 490 (N.Y. 2016) (citation and internal quotation marks omitted). "Summary judgment is highly unusual in a negligence action where the assessment of reasonableness generally is a factual question to be addressed by the jury." *Linwood*, 2019 WL 5722110, at *6 (alterations and citation omitted).

## I.   NEGLIGENT MAINTENANCE

It is well-established under New York law[10] that "an elevator company which agrees to maintain an elevator in safe operating condition may be liable to a passenger

---

[10] "In a diversity of citizenship case, state law . . . applies to substantive issues, and federal law applies to procedural issues." *Sarkees v. E. I. Dupont De Nemours & Co.*, 15 F.4th 584, 588 (2d Cir. 2021). Here, the incident at issue occurred at Gowanda, Docket Item 67-30 at ¶ 2; Docket Item 69-9 at ¶ 2, which is in New York, and both sides have relied on New York case law in arguing for and against summary judgment. *See* Docket Items 67-30 and 69-10. The Court therefore applies the substantive law of the State of New York. *See Ulerio v. Schindler Elevator Corp.*, 2014 WL 1303710, at *3 & n.3 (S.D.N.Y. Mar. 26, 2014) (applying New York substantive law in negligence case against elevator company in which "the accident occurred in New York . . . and the parties have either argued or assumed that New York law applies"); *Morton v. Otis Elevator Co.*, 2011 WL 2199848, at *1, *5 n.2 (W.D.N.Y. June 7, 2011) ("It is not

for failure to correct conditions of which it has knowledge or failure to use reasonable care to discover and correct a condition which it ought to have found." *Morton*, 2011 WL 2199848, at *5 (alterations omitted) (quoting *Rogers v. Dorchester Assocs.*, 32 N.Y.2d 553, 559, 300 N.E.2d 403, 405-06 (N.Y. 1973)); *see Hussey v. Hilton Worldwide, Inc.*, 164 A.D.3d 482, 483-84, 82 N.Y.S.3d 565, 567 (2d Dep't 2018) (citing same standard for elevator company's liability).

"In a negligence action, [an elevator] company may establish *prima facie* entitlement to summary judgment by presenting competent evidence in admissible form showing that the elevator was functioning properly before and after the accident, and that, even if a defect . . . existed, the company did not have actual or constructive notice of any such defect." *Meade v. Otis Elevator Co.*, 2017 WL 6509259, at *6 (S.D.N.Y. Dec. 18, 2017) (citation and internal quotation marks omitted); *see Lasser v. Northrop Grumman Corp.*, 55 A.D.3d 561, 562, 865 N.Y.S.2d 301, 302 (2d Dep't 2008) (collecting cases). If the company makes that showing, the burden then shifts to the plaintiff to "come forward with evidence capable of showing that the defendant either: (1) created the defect; or (2) had actual or constructive notice of the defect." *Ulerio*, 2014 WL 1303710, at *4 (citation and internal quotation marks omitted).

### A.   *Prima Facie* Case

Otis argues that the evidence clearly "demonstrates that [it] performed proper and appropriate maintenance consistent with the contract and industry standards."

––––––––––––––––––––––

disputed that the substantive law of negligence, as interpreted by the New York State courts, applies in [a negligence action against an elevator company based on an incident that occurred in New York].").

Docket Item 67-31 at 10; *see also id.* at 8-11.  According to Otis, the fact that the elevator operated normally before and after the incident is shown by Livecchi's own testimony, Docket Item 67-16 at 87, 97, as well as by Muck's, Docket Item 67-21 at 36.  Otis also points to its own maintenance records for elevator 86-W2, which it identifies as the A south elevator; Otis says that those records show that "in the one year prior to the accident, there were only two . . . complaints or issues . . . reported," both irrelevant to Livecchi's incident.  Docket Item 67-7; Docket Item 67-30 at ¶¶ 43-44.  Finally, Otis notes that its expert, Halpern, concluded that the incident was likely the result of a power outage—and that power is not Otis's responsibility.  *See* Docket Item 67-27 at ¶¶ 19, 24, 29.

The Livecchis argue that Otis has not established its *prima facie* entitlement to summary judgment because it has "fail[ed]" to produce "sufficient evidence of prior inspection and maintenance of the [A south] elevator."  Docket Item 69-10 at 14.  They contend that the testimony of Muck, Barber, and Emhoff creates a genuine issue of material fact as to whether Otis was "properly recording [and documenting] complaints" made on Otis Line.  Docket Item 69-10 at 16-17.  Further, they assert that Grimmelt's inability to keep contemporaneous records of the service that he performed on Gowanda's elevators also raises a question of fact about the accuracy of those records.  *See id.* at 9.  And they say that there is a question of material fact about whether the records that Otis produced are, in fact, the records for the A south elevator in which the incident occurred.  *Id.* at 16.

The Court agrees with the Livecchis.  Although a plaintiff's "mere speculation" that an elevator company's service records are "incomplete" and "cannot be trusted" is

not enough to "create a genuine issue of material fact," *Meade*, 2017 WL 6509259, at *6 (alterations omitted), the Livecchis have offered more than conclusory assertions of insufficiency here.  There are at least two material issues of fact as to whether Otis's records are sufficient.

### 1.      Whether the Records Are Complete

First, there is the issue of whether Otis's records are complete—that is, whether they include all maintenance issues reported to Otis.  Otis says that "[a]ll calls to Otis[ L]ine are documented" in its maintenance records and that those records show that Gowanda never alerted Otis to Livecchi's incident or any similar issues.  Docket Item 67-30 at ¶¶ 47-49, 54, 76.  But Muck testified that he likely reported Livecchi's incident to Otis.  *See* Docket Item 67-21 at 35-37; Docket Item 69-9 at 10, ¶ 53; 14, ¶ 76.  In fact, he stated that although he does not specifically recall reporting Livecchi's incident, he generally—"nine times out of ten"—reported any elevator incident involving an injury, and that if he did not report Livecchi's accident, he reported the second incident a few weeks later when one of Gowanda's "maintenance men . . . observed the same situation that happened to" Livecchi.  Docket Item 67-21 at 34-37.

The absence of any such reports in Otis's records is enough to create a genuine issue of material fact about whether those records are complete.  *Cf. Burgess v. Otis Elevator Co.*, 114 A.D.2d 784, 785, 495 N.Y.S.2d 376, 379 (1st Dep't 1985) (upholding verdict for plaintiff on the grounds that "the jury . . . could have found that [the] defendant had actual or constructive notice of the defective condition from the [building manager's] testimony . . . that there had *probably* been complaints that some of the automatic elevators [including the elevator at issue in the case] misleveled at a given

floor by more than two inches; and that he *thought* there had been complaints that some of [those elevators] did not platform correctly on the [relevant] floor" (emphases added)), *aff'd*, 69 N.Y.2d 623, 503 N.E.2d 692 (N.Y. 1986).  Barber's and Emhoff's testimony about issues with the A tower elevators also might suggest that some reported complaints were not documented by Otis.  *See* Docket Item 67-23 at 20-24; Docket Item 67-22 at 23-24; *Burgess*, 114 A.D.2d at 785, 495 N.Y.S.2d at 379.  Further, the fact that the records were apparently created on cell phones—which by Grimmelt's own admission, he could not take into Gowanda—raises another question of fact about the accuracy of those records.[11]  Docket Item 67-25 at ¶ 6; Docket Item 69-9 at 17, ¶¶ 22-23.

In sum, there is a question of fact about whether Otis's maintenance records are complete.

## 2.    Whether the Records are Correct

Second, there is the issue of whether the records that Otis has offered are the correct ones.  Otis says that the A south elevator is identified in its records as "86-W2."  Docket Item 67-30 at ¶ 38.  But Seymour's observations and the inconsistencies in Grimmelt's testimony raise a question about whether that assertion is accurate.[12]  *See*

---

[11] In responding to the Livecchis' assertion that "[Gowanda] did not allow visitors to bring their phones in," Docket Item 69-9 at 17, ¶ 22, Otis stated that it "[did] not oppose the statement insofar as [it] appears to [express] the belief of . . . Seymour," Docket Item 70-2 at ¶ 22.  But Grimmelt himself asserted this fact in his affidavit, which Otis submitted as part of its motion for summary judgment.  Docket Item 67-25 at ¶ 6.

[12] The Livecchis argue that Grimmelt's identification of the A south elevator as "86-W2" in his affidavit should be "rejected" as "contradict[ing] his deposition testimony" and thus "feigned for the purposes of summary judgment."  Docket Item 69-10 at 16.  But there is no need for the Court to take such a drastic step here.  Indeed, the cases that the Livecchis cite in support of this argument concern the "'sham issue of fact'

Docket Item 69-5 at ¶¶ 7, 51 (Seymour's explaining that based on his review of the records and site, "[he] concluded that the [A south] elevator was identified as 86-4" in Otis's records); Docket Item 67-17 at 71-73 (Grimmelt's stating that he was unable to identify which elevator at Gowanda was 86-W2); Docket Item 67-25 at ¶¶ 7-9 (Grimmelt's identifying elevator 86-W2 as the A south elevator).   And in light of that dispute, the Court is unable to conclude, at this stage, that the records Otis has identified are those for the A south elevator.[13]

_____

doctrine," according to which "a party [may not] . . . defeat[] summary judgment simply by submitting an affidavit that contradicts . . . previous sworn testimony."  *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (citation omitted); *see Mack v. Unted States*, 814 F.2d 120, 124-25 (similar).  Those cases are inapposite here.

First, the Second Circuit has "emphasize[d] that a sham issue of fact exists only when the contradictions in a[] . . .  witness's testimony are inescapable and unequivocal in nature."  *In re Fosamax*, 707 F.3d at 194.  It is not clear that the contradictions here are so "inescapable": Grimmelt stated both in the deposition and in his affidavit that he was not accustomed to seeing the records in the form that Otis has presented them in this litigation.  Docket Item 67-17 at 73; Docket Item 67-25 at ¶ 7.  So there may be an explanation for the apparent contradiction.

Further, Otis is not seeking to *defeat* summary judgment but to establish its entitlement to it.  *See In re Fosamax*, 707 F.3d at 193.  So the question is not whether Otis is attempting to create a "sham issue of fact," but whether Grimmelt's testimony about the identification of the A south elevator is credible.  And that is a question for a jury.  As the Second Circuit explained in delineating the limits of the sham issue of fact doctrine, "[i]n the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness, or where the contradictions presented are not real, unequivocal, and inescapable, the general rule remains that a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury."  *Id.* at 194 n.4 (citation and internal quotation marks omitted).

[13] The Livecchis further argue that Otis's negligence can be inferred from the fact that they breached the contract with New York State in failing to keep the proper records and to "prepare and submit a preventative maintenance schedule."  Docket Item 69-9 at 15-16, ¶¶ 7-11.  Otis disputes this.  *See* Docket Item 70-2 at ¶¶ 7-11.  Because the Court finds that material issues of fact preclude finding that Otis has met its initial

"A[n elevator company] is not entitled to summary judgment on notice grounds where there is a failure to present sufficient evidence regarding its maintenance procedures in respect of an allegedly malfunctioning elevator." *Stewart v. World Elevator Co, Inc.*, 84 A.D.3d 491, 495, 922 N.Y.S.2d 375, 378 (1st Dep't 2011); *see also Ulerio*, 2014 WL 1303710, at *6-7 (finding that testimony that "maintenance records were only kept for [some elevator] repairs" created a material issue of fact as to the "adequacy of the[ defendants'] efforts to maintain the elevator in a reasonably safe condition"). And because Otis has not satisfied its "initial summary judgment burden," *Morton*, 2011 WL 2199848, at *5, the Court need not consider whether the Livecchis have rebutted that showing by producing evidence that Otis "created the defect [that caused the incident]; or . . . had actual or constructive notice of th[at] defect," *Linwood*, 2019 WL 5722110, at *6 (citation omitted).

## II.   *RES IPSA LOQUITUR*

The Livecchis argue that even if Otis had produced sufficient records, "[Livecchi's] claim that he was injured due to a sudden fall of the [A south] elevator creates an issue of fact" that must be "decided by the jury" under the theory of *res ipsa loquitur*. Docket Item 69-10 at 7, 19-25. Otis disagrees, arguing that *res ipsa loquitur* is inapplicable because the Livecchis have not shown that two of the necessary requirements to invoke that theory are met here. Docket Item 70-3 at 11-13. Again, and for the reasons that follow, the Court agrees with the Livecchis.

---

summary judgment burden, it need not and does not reach the question of whether Otis may have breached the contract.

*Res ipsa loquitur* "means '[t]he thing speaks for itself.'" *Manhattan by Sail, Inc. v. Tagle*, 873 F.3d 177, 180 (2d Cir. 2017). "The doctrine . . . 'does not state a separate theory on which a plaintiff may recover for injury,' but rather 'amounts to nothing more than a common[]sense appraisal of the probative value of circumstantial evidence.'" *Ulerio*, 2014 WL 1303710, at *4 (quoting *Abbott v. Page Airways, Inc.*, 23 N.Y.2d 502, 512, 245 N.E.2d 388, 393 (N.Y. 1969)) (internal quotation marks omitted). Essentially, *res ipsa loquitur* "enables a plaintiff to prevail in a certain type of circumstance in proving negligence even though the plaintiff cannot show exactly who or what caused [the] injury" on the theory that "a factfinder [could] infer negligence merely from the happening of the event that caused the harm." *Manhattan by Sail*, 873 F.3d at 180.

"In New York, a case may be committed to the jury on the theory of *res ipsa loquitur* . . . if the plaintiff demonstrates that (1) the event was of a kind which does not ordinarily occur in the absence of someone's negligence; (2) it was caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it was not due to any voluntary action or contribution on the part of plaintiff." *Linwood*, 2019 WL 5722110, at *9 (citation omitted); *Dermatossian v New York City Tr. Auth.*, 67 N.Y.2d 219, 226, 492 N.E.2d 1200, 1204 (N.Y. 1986) (same). The Livecchis have established all three of those elements here.

### A.    Kind of Event

Livecchi alleges that the elevator dropped suddenly from the second floor to the basement. Docket Item 69-9 at 2, ¶ 8. Docket Item 67-16 at 105-06. New York courts have held that such an occurrence is the kind to which the doctrine of *res ipsa loquitur* applies. *See Rivera v. Slade Indus., Inc.*, 199 A.D.3d 536, 537, 157 N.Y.S.3d 426, 427

(1st Dep't 2021) ("An elevator drop is the type of event that does not normally occur in the absence of negligence."); *Gonzalez v. Otis Elevator Co.*, 2012 WL 993476, at *3 (S.D.N.Y. Mar. 26, 2012) ("[C]ommon sense establishes that an adequately maintained elevator should not come to an unexpected and abrupt stop causing injuries to its passengers."); *Miller v. Schindler Elevator Corp.*, 308 A.D.2d 312, 313-14, 763 N.Y.S.2d 826, 826-27 (1st Dep't 2003) (denying defendant elevator company's motion for summary judgment and finding that plaintiff was entitled to present her claim for negligence on theory of *res ipsa loquitur* based on allegations that elevator "dropped suddenly" from the first floor to the basement). So under New York law, Livecchi has demonstrated—at least for the purposes of opposing summary judgment—that the alleged incident is the sort that would not generally occur without negligence.

Otis argues that "there was no sudden drop or 'free fall'" in this case because "the elevator did not descend fast enough to even trigger the elevator's safety mechanism." Docket Item 70-3 at 12. But Otis does not provide any citation in support of that assertion. *Id.* And that assertion is not self-evident—at least not to this Court.

Otis also argues that because its expert, Halpern, has determined "to a reasonable degree of engineering certainty[] that the cause of the sudden stop experienced by [Livecchi] was a momentary power outage," this is clearly not "the type [of event] that does not occur in the absence of negligence." *Id.* (citing Docket Item 67-27 at ¶ 19) (underlining omitted). "Given that evidence," Otis says, "there is simply no basis for concluding that it is more likely than not that the injury was caused by Otis['s] negligence." *Id.* But on a motion for summary judgment, the Court views all facts—including Livecchi's account of the incident—in the light most favorable to the non-

moving party. *Abdu-Brisson*, 239 F.3d at 465-66. And Halpern's conclusion that the incident resulted from a sudden loss of power appears to be at least somewhat inconsistent with Livecchi's testimony that the "lights went out" only after the elevator had completed its drop to the basement.[14] *See* Docket Item 67-16 at 106.; Docket Item 67-27 at ¶ 19.

Therefore, "while there is evidence before the Court that [Livecchi's] injury could have been caused by something other than negligence, . . . whether the incident was of a kind that would not normally occur in the absence of negligence is . . . a disputed material fact" to be decided by a jury. *Linwood*, 2019 WL 5722110, at *10 (internal quotation marks omitted); *see Rivera*, 199 A.D.3d at 537, 157 N.Y.S.3d at 426-27 (plaintiff could present case to jury under *res ipsa loquitur* notwithstanding the opinion offered by defendant's expert that "the elevator malfunction was caused solely by a loss of power" because that opinion "inaccurately described the elevator malfunction reported by plaintiff" and because "plaintiff raised an issue of fact as to the cause of the accident by submitting an affidavit by his own expert [stating that the other expert's opinion was incorrect]").

### B.    Exclusive Control

Next, the Court considers whether the A south elevator—the relevant "instrumentality" in this action—was "within the exclusive control of [Otis]." *See Linwood*, 2019 WL 5722110, at *9. Otis says that it was not, arguing that Muck's

---

[14] Further, Halpern's account certainly is inconsistent with the opinion advanced by Livecchi's expert. *See* Docket Item 67-27 (Halpern's report); Docket Item 69-5 (Seymour's report).

testimony "demonstrates that . . . Muck and others at Gowanda . . . would routinely exercise control over the elevators."  Docket Item 70-3 at 12-13.  But "[u]nder New York law, it is not necessary for the application of the *res ipsa loquitur* doctrine that there be but a single person in control of that which caused the damage."  *Linwood*, 2019 WL 5722110, at *11; *see also Kleinberg v. City of New York*, 61 A.D.3d 436, 438, 877 N.Y.S.2d 23, 26 (1st Dep't 2009) (stating that "the fact that more than one entity may have been in control of the elevator does not preclude the application of the doctrine" of *res ipsa loquitur*).  On the contrary, "exclusive control is not a rigid concept[ but] is subordinated to its general purpose, that of indicating that it *probably* was the defendant's negligence which caused the accident."  *Stone v. Courtyard Mgmt. Corp.*, 353 F.3d 155, 159 (2d Cir. 2003) (citation and internal quotation marks omitted).

"If an elevator company has an exclusive maintenance contract, such an undertaking renders the elevator at issue in the company's exclusive control of its maintenance, sufficient to meet the second element of the doctrine."  *Linwood*, 2019 WL 5722110, at *11 (alterations, citation, and internal quotation marks omitted); *Gonzalez*, 2012 WL 993476, at *4 (holding that "[g]iven the extent of Otis's duties under the service contract,  . . . the second element is satisfied by the level of control Otis exercised over the elevator's maintenance and functioning").  It is undisputed that Otis had a "full-service contract" according to which "it was required to maintain the elevators and keep them functioning properly and safely."  Docket Item 69-9 at 15, ¶ 5; Docket Item 70-2 at ¶ 5.  Therefore, under New York law, the Livecchis have sufficiently established that the elevator was within Otis's "exclusive control."

**C.      Plaintiff's Contribution**

Finally, there is no evidence that Livecchi's incident was "due to any voluntary action or contribution on [his] part."  *Linwood*, 2019 WL 5722110, at *9.  Notably, Otis does not even argue that *res ipsa loquitur* is inapplicable on that ground.  *See* Docket Item 70-3 at 11-13.  So the Livecchis' allegations meet the third *res ipsa loquitur* requirement.

In sum, the Court finds that the Livecchis have offered evidence sufficient to present their case to a jury on the theory of *res ipsa loquitur*.

<u>**CONCLUSION**</u>

For the reasons stated above, Otis's motion for summary judgment, Docket Item 67, is DENIED.


SO ORDERED.

Dated:   March 30, 2024
              Buffalo, New York



                                         */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE